# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

————

No. 13-60874

————

LOUISIANA PUBLIC SERVICE COMMISSION,

  Petitioner

v.

FEDERAL ENERGY REGULATORY COMMISSION,

  Respondent

United States Court of Appeals
Fifth Circuit

**FILED**

November 14, 2014

Lyle W. Cayce
Clerk

————

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

————

Before KING, DENNIS, and CLEMENT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

  The Louisiana Public Service Commission ("LPSC") seeks review of certain orders of the Federal Energy Regulatory Commission ("FERC") relating to the allocation of production costs among Entergy Corporation's ("Entergy") six operating companies. Because FERC's procedural and ratemaking decisions were not arbitrary and capricious, we DENY LPSC's petition for review.

## FACTS AND PROCEEDINGS

### I. Regulatory Background

  Section 201 of the Federal Power Act ("FPA") endows FERC with jurisdiction over the transmission and sale at wholesale of electricity in

No. 13-60874

interstate commerce. 16 U.S.C. § 824(a)-(b). FERC reviews all rates within its jurisdiction to ensure that they are "just and reasonable." *Id.* § 824d(a). In furtherance of this objective, FERC may, on its own initiative or upon the filing of a third-party complaint, investigate whether an existing rate is lawful. *Id.* § 824e(a). This is referred to as a "Section 206" proceeding. The complainant— whether it is FERC or a third party—bears the burden of proof to demonstrate that a rate is unjust or unreasonable. *Id.* § 824e(b). If FERC concludes that a rate is unlawful, it must set a new just and reasonable rate. *Id.* § 824e(a). A public utility itself may also pursue a rate change in a "Section 205" proceeding, and FERC has the power to determine whether the proposed rate is lawful and thus will take effect. *Id.* § 824d(d)-(e). If the public utility seeks to increase the rate, it bears the burden of proof to demonstrate that the increase is just and reasonable. *Id.* § 824d(e).

## II. Entergy System Agreement and Bandwidth Remedy

Entergy is a public utility holding company that sells electricity in Arkansas, Louisiana, Mississippi, and Texas through six operating subsidiaries.[1] *See La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 383 (D.C. Cir. 2008) ("*La. 2008*"). The operating companies collaborate for their mutual benefit and their generation and transmission facilities, although individually owned, are operated as a single electric system ("System"). *Id.* at 383-84, 394. Transactions among the six operating companies are governed by the System Agreement, a FERC-approved tariff that "acts as an interconnection and pooling agreement for the energy generated in the System and provides for the joint planning, construction and operation of new generating capacity in the

---

[1] At the time the Bandwidth remedy was imposed, Entergy had only five operating companies: Entergy Arkansas, Inc.; Entergy Mississippi, Inc.; Entergy Gulf States, Inc.; Entergy Louisiana, LLC; and Entergy New Orleans, Inc. At the end of 2007, Entergy Gulf States was split into Entergy Texas, Inc. and Entergy Gulf States Louisiana, L.L.C.

No. 13-60874

System." *Id.* at 383; *see also Entergy La., Inc. v. La. Pub. Serv. Comm'n*, 539 U.S. 39, 42 (2003). New generating capacity is added to the System on a rotating basis, and because each operating company bears the costs of the generation facilities in its jurisdiction, "the rotation of new plants throughout the System historically had the effect of roughly evening out investment costs over time among the operating companies." *La. 2008*, 522 F.3d at 384.

Although this rotation system prevented substantial deviations in operating costs between the subsidiaries for the first thirty years of the System's existence, the arrangement faltered in the early 1980s when Entergy Mississippi incurred billions of dollars in unanticipated costs in connection with its construction of a nuclear power plant. *Id.* FERC interpreted the System Agreement to require that production costs be "roughly equal" among the operating companies and ordered nuclear-investment equalization to remedy the disparity. *Id.* Production costs again diverged dramatically in the early 2000s when a spike in natural gas prices rendered electricity production more expensive for Entergy Louisiana, which relies more heavily on gas generation than its sister companies. *Id.* at 385. FERC again concluded that the System was "out of rough production cost equalization" and imposed a "bandwidth remedy." *Id.* at 388-89 (internal quotation marks omitted).

The bandwidth remedy establishes outer boundaries of +/-11% by which production costs may deviate from the System average. *Id.* at 387-89. Pursuant to this remedial measure, each calendar year the production costs of each operating company are calculated and, if necessary, "payments [are] made by the low cost Operating Company(ies) to the high cost Operating Company(ies) such that, after reflecting the payments and receipts, no Operating Company would have production costs more than 11 percent above the Entergy System average or more than 11 percent below the Entergy System average." *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 146 FERC ¶

3

61,152 at P 3 (2014).  The D.C. Circuit found that FERC had jurisdiction to allocate production costs among the operating companies, and upheld the bandwidth remedy as a reasonable exercise of the agency's discretion.  *La. 2008*, 522 F.3d at 389, 391.

## III. Bandwidth-Related Proceedings

### A. Bandwidth Remedy Compliance Filings

In conjunction with its legislation of the bandwidth remedy, FERC directed Entergy to implement the remedy into the System Agreement.  *La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 111 FERC ¶ 61,311 (2005) ("*Op. No. 480*"), *on reh'g*, 113 FERC ¶ 61,282 (2005) ("*Op. No. 480-A*").  Entergy submitted amendments to the System Agreement, which FERC accepted with modifications.  *See La. Pub. Serv. Comm'n v. Entergy Servs., Inc.*, 117 FERC ¶ 61,203 (2006) ("*2006 Compliance Order*"), *on reh'g and compliance*, 119 FERC ¶ 61,095 (2007), *pet. for review denied, La. Pub. Serv. Comm'n v. FERC*, 341 Fed. App'x. 649 (D.C. Cir. 2009).  Entergy modified "Service Schedule MSS-3" to prescribe a formula for calculating the production costs of the operating companies, which are then compared to the System average to determine whether a variation of greater than 11 percent from the average exists, and thus whether any rough production cost equalization payments are owed.  *See* Service Schedule MSS-3, Sec. 30.12 (formula for determining actual production costs); *id.* Sec. 30.13 (formula for determining average production costs); *2006 Compliance Order*, 117 FERC ¶ 61,203 at PP 23-27.[2]  Service Schedule MSS-3 also specifies that in populating the actual production cost formula inputs: "All Rate Base, Revenue and Expense items shall be based on the actual amounts

---

[2] The formula rate methodology is based on Exhibits 26 and 28 that Entergy submitted in the bandwidth remedy proceeding.  Exhibit 26 compared historical production costs of the operation companies for 1983-2002 and Exhibit 28 was a production cost analysis for September 2001 through August 2002 that detailed the figures supporting the data in Exhibit 26.

No. 13-60874

on the Company's books for the twelve months ending December 31 of the previous year as reported in FERC Form 1 or such other supporting data as may be appropriate for each Company . . . ." Service Schedule MSS-3, Sec. 30.12, n.1.[3]

## B. Annual Bandwidth Implementation Proceedings

As required by FERC, Entergy must annually file its rates calculated from Service Schedule MSS-3 and any bandwidth payments and receipts derived therefrom. These compliance filings implement the bandwidth formula using the prior calendar year's production costs.

### 1. First Bandwidth Proceeding

FERC scheduled the first annual bandwidth payment for June of 2007 and Entergy initiated the first bandwidth proceeding in May of 2007. On exceptions to many of the ALJ's findings, FERC clarified, as relevant here, that "the bandwidth formula in Service Schedule MSS-3 is the lawful rate," and that "amendments to correct errors or deficiencies . . . in the underlying methodology" could not be raised in an annual implementation proceeding. *Entergy Servs., Inc.*, 130 FERC ¶ 61,023 at PP 12, 170, 245 (2010) ("*Op. No. 505*"), *on reh'g*, 139 FERC ¶ 61,103 (2012) ("*Op. No. 505–A*"). LPSC and Entergy each filed still-pending petitions for review of FERC's orders related to the first bandwidth proceeding in the D.C. Circuit.

### 2. Second Bandwidth Proceeding

Entergy initiated the second bandwidth proceeding in May of 2008. FERC again heard exceptions to the ALJ's rulings on various issues, including the proper scope of bandwidth proceedings. *Entergy Servs. Inc.,* 137 FERC ¶ 61,029 (2011) ("*Op. No. 514*"), *reh'g denied*, 142 FERC ¶ 61,013 (2013) ("*Op.*

---

[3] FERC Form 1 is the annual report FERC requires large electric utilities to file each April. *See* 18 C.F.R. § 141.1.

No. 13-60874

*No. 514–A*").   LPSC appealed FERC's orders to the Fifth Circuit and, as discussed *infra*, a panel of this court denied FERC's petition for review.  *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540 (5th Cir. 2014) ("*Second Bandwidth Decision*").

### 3. Third Bandwidth Proceeding

The third bandwidth proceeding began in May of 2009.  The ALJ ordered issues related to certain depreciation inputs removed from the proceeding based on FERC's ruling in *Op. No. 505* that the reasonableness of expense inputs cannot be litigated in annual bandwidth filings.  FERC upheld the ALJ's removal order on interlocutory appeal.  *See Entergy Servs., Inc.*, 130 FERC ¶ 61,170 (2010) ("*Third Bandwidth Interlocutory Order*").  After completing the hearing, the ALJ ruled that casualty loss ADIT recorded in bandwidth-eligible accounts is to be included in the bandwidth calculation.  *Entergy Servs., Inc.*, 132 FERC ¶ 63,005 at PP 275-77 (2010) ("*Third Bandwidth Initial Decision*"). FERC affirmed the ALJ's decision in relevant respects and those orders are now on review in this petition.  *See Entergy Servs., Inc.*, 139 FERC ¶ 61,105 (2012) ("*Op. No. 518*"), *on reh'g*, 145 FERC ¶ 61,047 (2013) ("*Third Bandwidth Rehearing Order*").

### 4. Fourth Bandwidth Proceeding

Entergy initiated the fourth bandwidth proceeding in May of 2010. FERC set the matter for hearing and LPSC raised a number of issues that it had raised in previous bandwidth proceedings, such as treatment of certain ADIT and depreciation inputs.  *Entergy Servs., Inc.*, 132 FERC ¶ 61,065 at P 15 (2010), *on reh'g*, 137 FERC ¶ 61,019 (2011) ("*Fourth Bandwidth Rehearing Order*").  After further clarification from FERC, *Entergy Servs., Inc.*, 145 FERC ¶ 61,049 (2013) ("*Fourth Bandwidth Clarification Order*"), the ALJ issued an initial decision in the fourth bandwidth proceeding on September 19, 2014,

No. 13-60874

*Entergy Servs., Inc.*, 148 FERC ¶ 63,015 (2014) ("*Fourth Bandwidth Initial Decision*").

### 5. Further Bandwidth Proceedings

The fifth, sixth, and seventh annual bandwidth proceedings (filed in May of 2011, 2012, and 2013, respectively) remain pending before FERC, which has held the matters in abeyance pending resolution of the earlier bandwidth proceedings.  *See Entergy Servs., Inc.*, 136 FERC ¶ 61,057 at P 21 (2011); *Entergy Servs., Inc.*, 140 FERC ¶ 61,111 at P 32 (2012); *Entergy Servs., Inc.*, 144 FERC ¶ 61,167 at P 30 (2013).

### C. Complaint Proceedings

LPSC and the Arkansas Public Service Commission (APSC) have also filed complaints with FERC outside of the annual bandwidth proceedings under Section 206 (and purportedly under Section 205) of the FPA challenging the bandwidth formula.

### 1. Scope Complaint (2008)

Before the administrative hearing in the first bandwidth proceeding, LPSC filed a complaint challenging Entergy's methodology and the inputs used to calculate the operating companies' production costs.  FERC dismissed all issues "covering methodology deviation and the justness and reasonableness of cost inputs" because they were currently before FERC in the first bandwidth proceeding and there was "no need to establish a separate proceeding to address them." *La. Pub. Serv. Comm'n v. Entergy Corp.*, 124 FERC ¶ 61,010 at P 27 (2008) ("*Louisiana Complaint*").

### 2. Arkansas Complaint (2009)

After Entergy's initial bandwidth filing, APSC filed a complaint to modify formula language relating to depreciation and nuclear decommissioning expenses.  FERC denied the complaint, explaining that the formula language was appropriate because FERC "must ensure that the inputs

No. 13-60874

used to calculate the bandwidth are . . . just and reasonable" and "the authority to determine the payments under the bandwidth necessarily must include the ability to examine the inputs used to calculate the bandwidth." *Ark. Pub. Serv. Comm'n*, 128 FERC ¶ 61,020 at P 25 (2009) ("*Arkansas Complaint*"). In its October 2011 rehearing order, after ruling on the first two bandwidth proceedings, FERC noted that it had issued "clarification in a number of orders" since its initial decision, and that modifications to the formula methodology in Service Schedule MSS-3 must be made in a separate section 205 or 206 filing. *Ark. Pub. Serv. Comm'n*, 137 FERC ¶ 61,030 at P 21 (2011) ("*Arkansas Rehearing Order*"); *see also id.* at P 23 ("If parties believe that the methodology in Service Schedule MSS-3 with respect to depreciation expenses should be changed, they should file a separate section 206 complaint (or, in the case of Entergy, a section 205 filing).").

### 3. Out-of-Period Complaint (2011)

In 2011, LPSC filed a section 206 complaint to force Entergy to remove from the second and third bandwidth calculations costs and expenses that, although recorded in relevant FERC accounts for those years, related to periods before the bandwidth remedy took effect. FERC denied the complaint insofar as it sought retroactive relief on the grounds that such relief would require a modification to the bandwidth formula, which is not permitted retroactively under the FPA. *La. Pub. Serv. Comm'n v. Entergy Corp.*, 139 FERC ¶ 61,102 at PP 26-27 (2012). FERC held the complaint for prospective relief in abeyance. *Id.* at P 28.

## IV. Orders on Review

LPSC raises two issues on appeal. At the initial hearing in front of the ALJ, LPSC argued that certain revenues and expenses should be removed from the bandwidth calculation for 2008 because they were not incurred in that test year. LPSC also argued that the production cost formula should account for

the mid-year acquisition of generation facilities by Entergy Gulf States Louisiana and Entergy Arkansas on a partial-year basis.  FERC affirmed the ALJ's rulings that Entergy did not have the discretion to exclude out-of-period costs or implement partial-year accounting.  FERC held that because Service Schedule MSS-3 mandates that formula inputs be based on the "actual amounts" reported on the operating companies' FERC Form 1 reports, the bandwidth formula does not permit exclusion of out-of-period costs, and only allows for assets on the books at the end of the calendar year to be reflected in the calculation as though they had existed for the full year.  *Op. No. 518*, 139 FERC ¶ 61,105 at PP 43, 61.  FERC accordingly concluded that LPSC's challenges were challenges to the "justness and reasonableness" of the bandwidth formula itself and could not be raised in an annual bandwidth proceeding, but must be made through a separate FPA section 206 proceeding. *Id.* at P 44, 62.  On review, LPSC challenges as arbitrary (1) FERC's interpretation of the tariff as requiring inputs to be the "actual amounts" on FERC 1 forms and (2) FERC's reversal of its interpretation that annual bandwidth proceedings could be used to challenge unjust and unreasonable cost inputs into the formula.

FERC also affirmed the ALJ's ruling that casualty loss deferred taxes should be included in the bandwidth calculations for 2008.  *Id.* at P 84.  LPSC challenges this determination on the grounds that (1) it did not receive proper notice that casualty ADIT could be included in the production cost formula and (2) FERC did not provide a rational basis for its inclusion.

## STANDARD OF REVIEW

FERC's orders are reviewed under the Administrative Procedure Act's "arbitrary and capricious" standard.  *See* 5 U.S.C. § 706(2)(A); *La. 2008*, 522 F.3d at 391. To satisfy this standard, FERC "must examine the relevant data and articulate a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). FERC's ratemaking decisions are entitled to "great deference." *Morgan Stanley Capital Grp. v. Pub. Util. Dist. No. 1*, 554 U.S. 527, 532 (2008); *see also Pub. Utils. Comm'n of State of Cal. v. FERC*, 254 F.3d 250, 254 (D.C. Cir. 2001) ("Because issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission, our review of whether a particular rate design is 'just and reasonable' is highly deferential." (internal quotation marks and alterations omitted)). If language in the System Agreement is ambiguous, we defer to FERC's construction of the provision so long as it is reasonable. *Second Bandwidth Decision*, 761 F.3d at 553. In this circuit, however, a reviewing court will not defer to FERC's construction of a tariff unless the agency relied on its factual or technical expertise in arriving at its interpretation. *See id.*; *Tenn. Gas Pipeline Co. v. FERC*, 17 F.3d 98, 102 (5th Cir. 1994).

## DISCUSSION

## I. FERC reasonably excluded challenges to the "justness and reasonableness" of formula inputs from annual bandwidth implementation proceedings.

LPSC first challenges FERC's rulings that Entergy could not modify cost inputs to exclude out-of-period costs or account for the fact that two of the operating companies had not owned their newly-acquired plants for a full year. As LPSC makes clear, these rulings are not simply a procedural inconvenience, because even if LPSC's underlying grievances are rectified in a complaint proceeding, the inputs will be modified only prospectively. *See Louisiana Pub. Serv. Comm'n v. Entergy Corp.*, 139 FERC ¶ 61,102 at PP 26-27 (2012); *City of Anaheim, Cal. v. FERC*, 558 F.3d 521, 523 (D.C. Cir. 2009) ("On its face, § 206(a) prohibits retroactive adjustment of rates."). Because the out-of-period

No. 13-60874

costs and facility acquisitions are recorded for the bandwidth year at issue, altering the formula inputs prospectively will not allow Entergy Louisiana or Entergy Gulf States Louisiana—the two LPSC-regulated operating companies—to recover greater equalization payments based on those adjustments.[4]

### A. FERC reasonably interpreted the System Agreement and correctly applied the filed rate doctrine.

The bandwidth formula as laid out in Service Schedule MSS-3 of the System Agreement is the existing filed rate under the FPA. *Second Bandwidth Decision*, 761 F.3d at 555; *Op. No. 514*, 137 FERC ¶ 61,029 at P 49 ("[FERC] already found the formula rate contained in Service Schedule MSS-3 to be just and reasonable when it approved that formula as being in compliance with Opinion No. 480. Because [FERC] has approved the formula, it is the filed rate . . . ." (footnote omitted)); *see also Pub. Utils. Comm'n of State of Cal. v. FERC*, 254 F.3d 250, 254 & n.3 (D.C. Cir. 2001) ("[A] formula rate specifies the cost components that form the basis of the rates a utility charges its customers" and "the formula itself is the filed rate that provides sufficient notice to ratepayers."). Under the filed rate doctrine, "[t]he rate filed by the wholesale seller of electricity or fixed by FERC is the only lawful charge and deviation from it is not permitted upon any pretext." *California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1012 (9th Cir. 2004) (internal quotation marks and alteration omitted); *see also Montana-Dakota Utils. Co. v. Nw. Pub. Serv. Co.*, 341 U.S. 246, 251-52 (1951). Not only must utilities adhere to the filed rate, but "[FERC] itself has no power to alter a rate retroactively." *Ark. La. Gas Co. v. Hall*, 453

---

[4] It follows that the lower the bandwidth payments to the Louisiana entities, the more Louisiana consumers will likely be forced to pay for electricity. *See La. Pub. Serv. Comm'n*, 539 U.S. at 42 (noting that, because state regulators allow utility companies to recover their costs and a reasonable rate of return, "the cost allocation between operating companies is critical to the setting of retail rates.").

11

U.S. 571, 578 (1981). Even where FERC finds an existing rate to be unjust and unreasonable under the FPA, its replacement rate applies only prospectively. *See id.*

FERC has interpreted the bandwidth formula in the System Agreement to require that cost inputs be populated with the actual data on the operating companies' books for each year as reported in their FERC 1 forms. *See, e.g.*, *Op. No. 505*, 130 FERC ¶ 61,023 at P 171 ("[F]or calculating the 2006 production payments to be made in 2007, section 30.12 of Service Schedule MSS-3 mandates that Entergy use *the actual data that exists on the Operating Companies' books for 2006.*") Accordingly, FERC has concluded that adjustments to the formula inputs are adjustments to the bandwidth formula itself, and because the formula is the filed rate, challenges to the justness and reasonableness of the inputs cannot be raised in an annual bandwidth filing, but must instead be brought in a separate rate change proceeding. *See, e.g.*, *Third Bandwidth Interlocutory Order*, 130 FERC ¶ 61,170 at P 20 ("[T]he purpose of the annual bandwidth filings is to apply the specified formula using *actual* data to determine whether or not there was rough equalization, and not to determine what production costs would have been if different depreciation rates had been in effect for the relevant period."); *Fourth Bandwidth Clarification Order*, 145 FERC ¶ 61,049 at P 6 ("[T]he focus of litigation in the annual bandwidth filings is whether Entergy properly implemented the bandwidth formula, not whether the bandwidth formula is just and reasonable."). FERC has explained that the scope of challenges in annual bandwidth proceedings is limited to: "(1) whether the inputs were calculated consistent with the formula and the applicable accounting rules; (2) conformance with retail regulatory approvals . . . [;] and, (3) in instances where there are details omitted from the accepted Service Schedule MSS-3 formula, [whether Entergy's calculations comply] with the underlying details included

No. 13-60874

in the methodology used in Exhibits ETR-26 and ETR-28," as well as "the prudence of cost inputs to the bandwidth formula." *Fourth Bandwidth Rehearing Order*, 137 FERC ¶ 61,019 at P 13.

FERC's determination that the System Agreement mandates that Entergy use actual data on the companies' books is based on Footnotes 1 and 2 in Section 30.12 of Service Schedule MSS-3. Footnote 1 provides that: "All Rate Base, Revenue and Expense items shall be based on the actual amounts on the Company's books for the twelve months ending December 31 of the previous year as reported in FERC Form 1 or such other supporting data as may be appropriate for each Company . . . ." Footnote 2 likewise specifies that: "Rate Base values shall be based on the actual balances on the Company's books as of December 31 of the previous year . . . ." LPSC raises a number of challenges to FERC's interpretation of the System Agreement, but does not opine on whether FERC relied on its technical expertise to reach it. In any case, with or without special deference, FERC's interpretation is clearly not arbitrary.

LPSC argues in the first instance that FERC's interpretation reads out of Footnote 1 the clause "or such other supporting data as may be appropriate for each Company." LPSC asserts that this other "supporting data" alternative permits it to challenge the justness and reasonableness of formula inputs in a bandwidth proceeding if they are not reflective of the company's actual *costs* in the test year. But Footnote 1 does not state that formula inputs will be based on an operating company's actual costs. The provision plainly states that inputs "shall be based on the actual *amounts on the Company's books*" for the prior year. These amounts are determined by reference to FERC Form 1 or other supporting data. Thus, FERC could reasonably find that "other supporting data" is useful only insofar as it can be used to ascertain "actual

13

amounts on the Company's books" for the test year that were not included (or not included in a useful form) or were misrepresented in FERC Form 1.

Further, in the *Second Bandwidth Decision*, a panel of this circuit recently rejected LPSC's argument that it could challenge formula inputs as unjust or unreasonable in annual bandwidth proceedings. The specific issue in that case was whether FERC could modify depreciation rates set by retail regulators and incorporated into the bandwidth formula. As it did with the inputs at issue here, FERC concluded that the challenge to the state depreciation input constituted a challenge to the bandwidth formula itself that could not be raised in an annual bandwidth proceeding. This court found that "[t]he System Agreement reflects a decision to incorporate actual costs *reflected on FERC Form 1* into the formula." *Second Bandwidth Decision*, 761 F.3d at 555 (emphasis added). It agreed with FERC that supplanting the retail-set depreciation inputs would change the bandwidth formula and that such an "attack on the formula" in the bandwidth proceeding violated the filed-rate doctrine and thus was not valid. *Id.*

As this court concluded in the *Second Bandwidth Decision*, FERC's interpretation that the bandwidth formula requires inputs based on actual FERC 1 data is a plain reading of the System Agreement—specifically, Footnotes 1 and 2 to Service Schedule MSS-3—and is not arbitrary or irrational. "Unlike FERC's interpretation, [LPSC]'s interpretation undercuts th[e] remedial scheme in favor of a yearly reconstruction of each company's costs in the bandwidth proceedings." *Id.* Although LPSC protests that prohibiting challenges to the justness and reasonableness of formula inputs in annual bandwidth proceedings will leave consumers without a complete remedy, "the absence of retroactive relief is a function of the filed-rate doctrine." *Id.* at 556. Therefore, regardless of the merits of LPSC's underlying challenges to the reasonableness of the formula inputs, it could not seek to

modify the definition of those inputs in the third bandwidth proceeding. LPSC does not contend that Entergy failed to use the FERC Form 1 values as prescribed in the System Agreement or that it made a calculation error implementing the algebraic equation. Accordingly, LPSC's challenges to Entergy's inclusion in the production cost formula of end-of-year rate balances for newly-acquired generation plants and out-of-period revenues and expenses drawn from the operating companies' FERC Form 1 filings are not cognizable in a bandwidth proceeding.

**B. FERC's reversal of its initial interpretation of the scope of bandwidth implementation proceedings was not arbitrary.**

LPSC also argues that because FERC previously held that it would review the justness and reasonableness of cost inputs in the annual bandwidth proceedings, its subsequent decision "without explanation" to exclude such review in the proceedings was arbitrary. It is true that, in two of its early orders, FERC stated that challenges to the formula inputs could be raised at the annual bandwidth proceedings, and even dismissed part of LPSC's 2008 Scope Complaint on that ground. But FERC corrected its previous interpretation in its very first ruling on an annual bandwidth proceeding. *Op. No. 505*, 130 FERC ¶ 61,023 at PP 172-73. As this court found in the *Second Bandwidth Decision*, "FERC changed its interpretation in light of its gained experience conducting annual bandwidth proceedings, explained its new interpretation of the System Agreement, and consistently has interpreted the System Agreement after the change." 761 F.3d at 556. "Here, FERC offered a reasoned explanation for its approach; no more is required." *Id.* (internal quotation marks and alteration omitted).

LPSC continues that FERC's attempts at clarification were beset by inconsistency and that the agency has now "shift[ed] back" to its original interpretation. LPSC points to the *Fourth Bandwidth Clarification Order*'s

statement that "challenges in a bandwidth proceeding can include whether the formula was misapplied or miscalculated because the inputs were unjust and unreasonable."  145 FERC ¶ 61,049 at P 14.[5]  Although this statement in isolation could be read to support LPSC's reversion argument, it loses its force when considered in context.  In responding to LPSC's request that FERC "clarify what it meant by limiting the bandwidth challenges to the prudence of cost inputs" in the *Fourth Bandwidth Rehearing Order*, *id.* at P 13, FERC stated:

> The Rehearing Order provided that parties can challenge whether the inputs were calculated consistent with the formula and the applicable accounting rules. As part of its determination, the Commission also stated that "with respect to whether or not particular costs were prudently incurred," parties can challenge the prudence of those cost inputs. *We clarify that challenges that may be raised in a bandwidth implementation proceeding to the "inputs" used in the bandwidth formula include misapplication of the formula rate (such as use of erroneous data or incorrect calculations), which includes the prudence of a cost input.* On this basis, the Rehearing Order did not limit challenges to "the prudence of cost inputs." Instead, challenges in a bandwidth proceeding can include whether the formula was misapplied or miscalculated because the inputs were unjust and unreasonable. However, challenges to the formula itself, not the inputs, must be brought in an FPA section 205 or section 206 proceeding.

*Id.* at P 14 (emphasis added) (footnotes omitted).

In explaining that the *Fourth Bandwidth Rehearing Order* did not "limit" challenges at the annual bandwidth proceedings to the prudence of cost

---

[5] LPSC raised this same reversion argument based on the *Fourth Bandwidth Rehearing Order* in the *Second Bandwidth Decision*.  Although not specifically addressed in that opinion, given the panel's conclusion that FERC has interpreted the System Agreement consistently since the first bandwidth proceeding, that panel evidently also found LPSC's claim unpersuasive.

inputs,[6] FERC repeated its instruction that challenges may be made to the "misapplication of the formula rate (such as use of erroneous data or incorrect calculations)." *Id.* FERC continued that such challenges included, but were not limited to, the prudence of cost inputs. *Id.* Accordingly, FERC's statement that challenges "can include whether the formula was misapplied or miscalculated because the inputs were unjust and unreasonable" related to the just-referenced input of erroneous data or incorrect calculations, not to the merits of including each formula input itself. *See id.* This reading is consistent with other statements in the order. *See id.* at P 12 ("[P]arties can challenge in a bandwidth proceeding erroneous inputs, implementation errors, or prudence of cost inputs. However, challenges to the bandwidth formula itself must be raised in an FPA section 206 complaint or section 205 filing."). In any case, ambiguity in the use of the phrase "unjust and unreasonable" in the *Fourth Bandwidth Clarification Order* is not sufficient to cast doubt on the litany of FERC orders clarifying that formula inputs may be challenged for incorrect data, faulty math, and imprudent expenditures—not for whether the cost variables themselves should be included in the formula.[7] *See, e.g.*, *Op. No. 505*, 130 FERC ¶ 61,023 at PP 172-73; *Op. No. 505-A*, 139 FERC ¶ 61,103 at P 50;

---

[6] A cost is prudent if it is one that "a reasonable utility management (or that of another jurisdictional entity) would have made, in good faith, under the same circumstances, and at the relevant point in time." *Op. No. 505*, 130 FERC ¶ 61,023 at P 51 (citation omitted). LPSC previously understood that "imprudence occurs when it is determined that a utility acted unreasonably when incurring a cost, and that an imprudent cost is an unreasonable cost that violates the just and reasonable standard of the Federal Power Act." *Entergy Servs., Inc.*, 137 FERC ¶ 61,019 at P 6 (2011). Insofar as LPSC is now contending that it understands imprudence to allow challenges to any perceived unjust cost input, such an interpretation is unreasonable.

[7] LPSC also cites a recent order of an ALJ that cites the "unjust and unreasonable" language from the *Fourth Bandwidth Clarification Order*. *See Fourth Bandwidth Initial Decision*, 148 FERC ¶ 63,015 at PP 33, 39. To the extent the ALJ interpreted FERC as permitting challenges to formula inputs outside of faulty math, erroneous data, or imprudent expenditures, this was inconsistent with FERC's position for the reasons described above. We also note that the ALJ's decision has not yet been reviewed by FERC.

No. 13-60874

*Op. No. 514*, 137 FERC ¶ 61,029 at P 48; *Third Bandwidth Interlocutory Order*, 130 FERC ¶ 61,170 at P 20; *Op. No. 518*, 139 FERC ¶ 61,105 at PP 25-26; *Fourth Bandwidth Rehearing Order*, 137 FERC ¶ 61,019 at PP 11-12; *Arkansas Rehearing Order*, 137 FERC ¶ 61,030 at PP 21-23.

LPSC's petition for rehearing of FERC's order that LPSC cannot challenge the justness and reasonableness of including certain cost inputs in the bandwidth formula during an annual bandwidth proceeding is denied.

## II. FERC reasonably required Entergy to include casualty loss ADIT in its third bandwidth calculation.

LPSC next claims that FERC's ruling that Entergy must include casualty loss ADIT in its third bandwidth calculation (1) violated due process and statutory notice requirements and (2) is arbitrary because FERC failed to provide a rational explanation for its inclusion.

ADIT is defined in the bandwidth formula as:

ADIT = Net Accumulated Deferred Income Taxes (ADIT) recorded in FERC Accounts 190, 281 and 282 (as reduced by amounts not generally and properly includable for FERC cost of service purposes, including but not limited to, SFAS 109 ADIT amounts and ADIT amounts arising from retail ratemaking decisions) plus Accumulated Deferred Income Tax Credit-3% portion only recorded in FERC Account 255[.]

Service Schedule MSS-3, Sec. 30.12.

In its third bandwidth filing, Entergy excluded from the operating companies' production cost calculations ADIT associated with both net operating losses (NOL) and casualty losses, recorded in FERC accounts 190 and 282, respectively. A NOL is an "income tax benefit that may be carried forward to future years and treated as an offset to future years' taxable income." *Entergy Servs., Inc.*, 145 FERC ¶ 61,045 at P 3 n.10 (2013). As LPSC's witness testified in the third bandwidth proceeding, the NOL ADIT amounts in account 190 "represent the tax benefits that the operating

18

No. 13-60874

companies have not yet been able to realize because of insufficient taxable income." Thus, this is an asset ADIT account that generally increases the rate base. In contrast, the casualty loss ADIT in account 282 is a liability account that generally decreases the rate base.

An Entergy witness testified at the third bandwidth hearing that Entergy's exclusion of NOL ADIT was consistent with Entergy's treatment of NOL ADIT in its two previous bandwidth filings. Casualty loss ADIT was not an issue in the prior filings because those amounts were previously recorded in account 283, which the System Agreement did not specify for use in the bandwidth formula. Prior to the third bandwidth filing, however, Entergy reclassified certain ADIT amounts, including casualty loss taxes, into account 282, which is included in the bandwidth calculation. Entergy's third bandwidth filing letter explained this reclassification, and the parties agreed in the Joint Statement of Issues that there was no dispute as to the propriety of the account reclassification.

After Entergy submitted its third bandwidth filing, FERC issued *Op. No. 505*, in which FERC, siding with LPSC, reversed the ALJ's decision that Entergy could exclude from the first bandwidth filing all NOL ADIT amounts. 130 FERC ¶ 61,023 at PP 233-34. FERC explained that, "[t]o the extent storm damage costs are amortized to expense accounts included in the bandwidth calculation (production storm damage expense), such costs are included in a [FERC] cost-of-service rate. Therefore, consistent with Service Schedule MSS-3, ADIT for NOL carryforwards associated with production storm damage expenses may not be excluded from the bandwidth calculation." *Id.* at P 234. Because of this ruling, one of the issues to be litigated at the third bandwidth hearing was what portion of NOL ADIT to include in the bandwidth calculation.

19

No. 13-60874

In his pre-filed Final Testimony, Entergy witness Bruce Louiselle compared the amounts of casualty loss ADIT and NOL ADIT for the operating companies to demonstrate that casualty loss ADIT "far exceeds" NOL ADIT. Louiselle explained that "[w]hat is important is that [Entergy] excluded both the storm-caused NOL ADIT *and* the storm-caused Casualty Loss ADIT on a consistent basis and for the same reason, *to wit*: such amounts are not generally and properly includable for FERC cost of service purposes." Louiselle also testified that LPSC's proposal "to include the storm-caused NOL ADIT recorded in Account 190 but not to include the storm-caused ADIT recorded in Account 282" amounted to "'cherry picking' which storm-caused tax effects to include."[8] A FERC Trial Staff witness concurred that, if storm-related NOL ADIT were included in the calculation, storm-related casualty loss ADIT should be included as well.

Affirming the ALJ's initial decision, FERC ruled that both NOL ADIT and casualty loss ADIT that are properly includable for cost-of-service purposes should be included in the bandwidth calculation. *Op. No. 518*, 139 FERC ¶ 61,105 at P 84. FERC rejected Entergy's argument that *Op. No. 505* required that "only that portion of storm-related ADIT which is attributable to production may be included in the Bandwidth calculation." *Id.* at P 87 (alteration and internal quotation marks omitted). FERC explained that:

> The Net Operating Loss carry-forwards are the result of a calculation that combines all the revenues and expenses of Entergy. The Net Operating Loss is made up of many expenses, none of which, in isolation, can be considered the singular cause of the Net Operating Loss. Therefore, attributing ADIT related to the Net Operating Loss to a particular expense or function in isolation

---

[8] In addition to his pre-filed testimony, Louiselle also testified on redirect testimony at the hearing that if the ALJ or FERC included NOL ADIT, there is "no logical reason" not to also include casualty loss ADIT.

is arbitrary because the Net Operating Loss is not created by any single category of expenses. . . .

[T]o properly include Net Operating Loss ADIT amounts in bandwidth calculations, Entergy must multiply its Net Operating Loss carry-forward balance by the ratio of incurred expenses includable for [FERC] cost-of-service purposes to total expenses incurred during the period the Net Operating Loss was recognized. ADIT related to the calculated Net Operating Loss carry-forward balance to be included in the bandwidth calculations must then be allocated to the production function in the bandwidth formula using the plant ratios as prescribed by Service Schedule MSS-3.

*Id.* at P 85 (quoting *Op. No. 505-A*, 139 FERC ¶ 61,103 at P 59-60).

LPSC requested clarification as to whether Entergy was required to use the NOL ADIT ratio laid out in *Op. No. 518* to also determine the amount of casualty loss ADIT to include in the bandwidth calculation. FERC clarified that:

Entergy is not required to use the net operating loss ADIT ratio to determine the amount of casualty loss ADIT to include in bandwidth calculations. Instead, Entergy must include all the casualty loss ADIT amounts in bandwidth calculations without applying the net operating loss ADIT ratio, and Entergy must functionalize the casualty loss ADIT amounts to production based on plant ratios, in accordance with the provisions of the bandwidth formula.

*Third Bandwidth Rehearing Order*, 145 FERC ¶ 61,047 at P 22. FERC explained that, "[i]n comparison to the inability to attribute specific expenses to the cause of the net operating loss, the cause of the casualty loss is directly attributable to expenses incurred due to storm damages." *Id.* at P 24. FERC noted that "[n]either the [LPSC] nor Entergy contest that the casualty loss is not the result of storm damages." *Id.*

**A. LPSC had notice of the casualty loss ADIT issue.**

LPSC first claims that it did not receive notice that casualty loss ADIT would be included in the bandwidth formula, in violation of the APA and its

due process rights.  *See* 5 U.S.C. § 554(b)(3) (agency shall give parties notice of "the matters of fact and law asserted"); *Pub. Serv. Comm'n v. FERC*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) ("The Due Process Clause and the APA require that an agency setting a matter for hearing provide parties with adequate notice of the issues that would be considered, and ultimately resolved, at that hearing." (internal quotation marks omitted)).  LPSC argues that FERC violated its notice obligation because Entergy did not propose to include—and in fact, specifically excluded—casualty loss ADIT from its third bandwidth calculation in its filing letter.[9]

LPSC is correct that Entergy's filing letter identified that it did not include casualty loss ADIT in its bandwidth calculation, but LPSC's conclusion that this statement prevented it from receiving notice of the issue completely omits the context in which it was made.  As discussed above, the System Agreement provides that ADIT amounts recorded in accounts 190 and 282 that are generally and properly includable for FERC cost-of-service purposes should be included in the bandwidth formula.  Entergy's filing letter acknowledged that casualty loss ADIT had been moved into account 282, but stated that, like NOL ADIT, casualty loss ADIT was not included in the bandwidth calculation because it was "storm-related."  *After* Entergy submitted its filing letter, FERC issued *Op. No. 505*, which, *in response to LPSC's challenge*, held that Entergy must include storm-related NOL ADIT in eligible accounts in the bandwidth formula.  *See Op. No. 505*, 130 FERC ¶ 61,023 at PP 233-34.  Accordingly, LPSC was certainly on notice that Entergy's justification for excluding casualty loss ADIT—that it was "due to storm losses"—was no longer valid and

---

[9] FERC argues that LPSC has waived its due process argument because it did not specifically raise it on rehearing.  But LPSC certainly pressed its lack-of-notice argument, which is the basis for its denial of due process claim.  Although LPSC has repackaged its claims as due process violations, it is not raising in the instant petition any argument that was not previously considered by FERC.

that FERC, consistent with its ruling in *Op. No. 505*, could require Entergy to include casualty loss ADIT in the formula. Indeed, Entergy submitted pre-filed testimony that NOL ADIT and casualty loss ADIT were excluded on the same basis, and, consequently, including the former but not the latter would constitute "cherry-picking."

The amount of NOL ADIT to be included in the bandwidth formula was listed as an issue to be litigated in the bandwidth hearing. Multiple witnesses, including LPSC's own, were questioned about casualty loss ADIT in connection with NOL ADIT. Although it may have been strategic for LPSC to avoid the issue in an attempt to keep casualty loss ADIT out of the formula, that LPSC was ultimately unsuccessful in doing so does not indicate that it lacked notice that the ALJ or FERC would require inclusion of those deferred taxes consistent with *Op. No. 505*. *See Op. No. 518*, 139 FERC ¶ 61,105 at P 91 (finding LPSC had "ample opportunity" to address the casualty loss ADIT issue during the hearing). LPSC's notice argument is meritless.

**B. FERC's decision to include casualty loss ADIT in the bandwidth formula was rational.**

LPSC finally argues that FERC's requirement that Entergy include all casualty loss ADIT amounts in the bandwidth calculation is void because (1) FERC's decision to include storm-related casualty loss ADIT conflicts with one of its earlier decisions; and (2) there is no rational basis to include all of the recorded casualty loss ADIT but only a portion of the NOL ADIT.

LPSC first protests that FERC's inclusion of storm-related casualty loss ADIT in the bandwidth calculation departs without explanation from FERC's prior order approving a settlement excluding storm cost accruals in account 924 from the bandwidth calculation because "storm damage reserve is largely unrelated to production costs." *Entergy Servs., Inc.*, 128 FERC ¶ 61,275 at P 28 (2009). This contention fails for a number of reasons. First, it was not

raised before FERC and thus cannot be considered here.  *See* 16 U.S.C. § 825*l*(b) ("No objection to the order of [FERC] shall be considered by the court unless such objection shall have been urged before [FERC] in the application for rehearing unless there is reasonable ground for failure so to do.").  Second, FERC's approval of a settlement does not have precedential effect.  *Entergy Servs., Inc.*, 128 FERC ¶ 61,275 at PP 8-11; *see also Consol. Gas. Supply Corp.*, 14 FERC ¶ 61,291 at P 61,567 (1981) ("It is [FERC's] well established policy that settlements do not have precedential effect.").  Third, LPSC's broad assertion that *Op. No. 518* conflicts with FERC's "earlier determination that storm-related costs should not be included in the Bandwidth Calculation" is selective, if not disingenuous.  As discussed above, LPSC challenged the ALJ's decision in the first bandwidth proceeding excluding NOL ADIT amounts from the bandwidth calculation.  FERC agreed with LPSC and determined that storm damage costs (resulting from Hurricanes Katrina and Rita) amortized in bandwidth-eligible expense accounts are included in FERC's cost-of-service rate and must be included in the calculation.  *Op. No. 505*, 130 FERC ¶ 61,023 at P 234.  The ALJ relied on *Op. No. 505* in finding that storm damage expenses attributable to production are properly includable for cost-of-service purposes, *Third Bandwidth Initial Decision*, 132 FERC ¶ 63,005 at P 275, and FERC, consistent with *Op. No. 505*, affirmed this determination, *Op. No. 518*, 139 FERC ¶ 61,105 at P 88.  Thus, to the extent that FERC's initial treatment of storm-related costs varies from its current treatment of them, LPSC itself brought about this change by challenging the exclusion of such costs in the first bandwidth proceeding.

Finally, FERC thoroughly explained its reasons for including casualty loss ADIT amounts in the bandwidth calculation.  FERC stated that its decision was based on the plain language of the System Agreement, which expressly requires that ADIT amounts recorded in FERC account 282 be

included in the bandwidth formula to the extent they are includable for cost-of-service purposes. *Op. No. 518*, 139 FERC ¶ 61,105 at PP 84, 88. Casualty loss ADIT—as a result of Entergy's recent reclassification—was recorded in FERC account 282. *Id.* at PP 88, 92. Storm damage costs included in bandwidth-eligible accounts are includable for cost-of-service purposes. *Id.* at P 88 (citing *Op. No. 505*, 130 FERC ¶ 61,023 at P 234). Casualty loss ADIT amounts are directly attributable to storm damages. *Third Bandwidth Rehearing Order,* 145 FERC ¶ 61,047 at P 24 (explaining that neither LPSC nor Entergy disputed that casualty loss is the result of storm damages and that Louiselle's testimony supported this conclusion).[10]    Accordingly, because casualty loss ADIT was recorded in a bandwidth-eligible account and was generally and properly includable for cost-of-service purposes, FERC

---

[10] In proceedings related to the fourth bandwidth filing, LPSC argued to the ALJ that, in the third bandwidth proceeding, Entergy misled FERC as to the basis for casualty loss ADIT. LPSC contended that the testimony of Entergy's witness in the fourth bandwidth proceeding that the casualty loss tax deduction is a difference in the value of the damaged property before and after the catastrophic event contradicted Entergy's testimony in the third bandwidth proceeding that the deduction is based on recorded expenses for "internal labor, contracted labor, and materials and supplies used to repair or replace damaged property." LPSC argues here that the ALJ "found that casualty Loss ADIT is '*not* based on storm costs included in the expense accounts in the bandwidth formula,' but is 'the difference in the *value* of damaged property before and after a catastrophic event.'" This is a misrepresentation of the ALJ's findings.    The ALJ rejected LPSC's argument as to Entergy's "alleged contradiction" and found that LPSC's claim was the consequence of a "misunderstanding of basic tax law." *Fourth Bandwidth Initial Decision*, 148 FERC ¶ 63,015 at P 117. As the ALJ clearly explained, the casualty loss tax deduction is indeed technically a difference in the value of the damaged property, but "[t]he proxy that is properly used for tax purposes to represent that differential, since such values are hard to determine, is the *cost of repair* such as the 'internal labor, contracted labor, and materials and supplies used to repair or replace damaged property' as [Entergy's witness] testified in the Third Bandwidth Proceeding." *Id.* at P 118. Thus, contrary to LPSC's representation here that the ALJ's findings establish that casualty loss ADIT did not result from storm damages costs, the ALJ concluded that the storm-related costs are precisely those appropriately used to determine the casualty loss tax deduction.

reasonably concluded that the System Agreement required its inclusion in the bandwidth calculation.[11]

LPSC's irrationality challenge also fails for this same reason. LPSC argues that casualty loss ADIT was included in the bandwidth calculation solely because of its "alleged connection to NOL ADIT, based on the premise that both were caused by storm costs." The argument continues that, because FERC found that "casualty loss ADIT and net operating loss ADIT are not equivalent," *Third Bandwidth Rehearing Order,* 145 FERC ¶ 61,047 at P 24, the "nexus" between the two disappeared, and including casualty loss ADIT was therefore irrational.

As explained above, FERC's decision was necessitated by the System Agreement, which specifies that deferred taxes (1) recorded in FERC accounts 190 and 282 and (2) properly includable for cost-of-service purposes must be included in the bandwidth formula. In contrast to FERC's determination that all casualty loss ADIT is attributable to storm damages and thus properly includable for cost-of-service purposes, FERC found that not all NOL ADIT could be attributed to storm damage loss. *Third Bandwidth Rehearing Order,* 145 FERC ¶ 61,047 at PP 23-24. FERC explained that "the net operating loss is made up of many expenses, none of which, in isolation, can be considered the singular cause of the net operating loss." *Id.* at P 23. Because certain expenses associated with NOL ADIT "are not costs includable for [FERC] cost-of-service purposes," FERC requires Entergy to use a FERC-developed ratio to determine the amount of NOL ADIT that can be included in the bandwidth calculations. *Id.* In both instances, FERC, consistent with the explicit directive of the System Agreement, included only the portion of ADIT "properly includable for

---

[11] Because the bandwidth formula—the filed rate—includes casualty loss ADIT, LPSC's retroactive ratemaking argument is meritless.

cost of service purposes." *See id.* at P 22.   It was not irrational for FERC to refuse to require the use of the *net operating loss ratio* to determine the amount of *casualty loss ADIT* includable in the bandwidth calculation.  *See id.* at P 25 ("[I]t is unnecessary for Entergy to use the net operating loss ADIT ratio to determine casualty loss ADIT amounts to include in bandwidth calculations because the expenses associated with the casualty loss are directly attributable to storm damage costs . . . .").[12]

LPSC does not approach the showing needed to demonstrate that FERC's order to include all casualty loss ADIT amounts in bandwidth-eligible accounts in the production cost formula was irrational.  This is especially so in light of the deference given to FERC's ratemaking decisions.  LPSC's petition for review on the issue is denied.

## CONCLUSION

For the foregoing reasons, LPSC's petition for review of FERC's orders in the third bandwidth proceeding is DENIED.

---

[12] LPSC quotes Louiselle's testimony that "[e]xcept for [Entergy Arkansas], the storm costs of the other Operating Companies having federal NOL ADIT are or will be 'securitized'" and these securitized costs "are not included in the cost of service."  LPSC, however, does not raise any argument suggesting that casualty loss ADIT is securitized and should not be included in the bandwidth calculation.  Because LPSC has not briefed the issue, it is waived. *See* Fed. R. App. P. 28(a)(8)(A); *United States v. Whitfield*, 590 F.3d 325, 346 (5th Cir. 2009). In any case, here, as in front of FERC, LPSC "has not explained how [contra-securitization ADIT] amounts arise or demonstrated why they are 'generally and properly includable for FERC cost of service purposes.'" *Op. No. 518,* 139 FERC ¶ 61,105 at P 89.  When LPSC did present its argument that casualty loss ADIT should be offset by including formula cost entries for contra-securitization ADIT in the fourth bandwidth proceeding, the ALJ noted, as relevant here, that "Entergy's tax expert . . . testified at the [fourth bandwidth] hearing that casualty loss tax deductions are not securitized. Thus, the casualty loss ADIT that is included in the bandwidth calculation *cannot* be the corresponding entry to the contra-securitization ADIT amounts in question." *Fourth Bandwidth Initial Decision,* 148 FERC ¶ 63,015 at P 258 (footnotes omitted).  Likewise, here LPSC has not pointed to any evidence indicating that the storm damage costs related to the casualty loss ADIT included in the bandwidth formula for the third bandwidth proceeding were securitized.  For all of these reasons, any argument that LPSC intended to raise related to contra-securitization fails.