# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 14-60822

United States Court of Appeals
Fifth Circuit

**FILED**

August 8, 2016

Lyle W. Cayce
Clerk

EL PASO ELECTRIC COMPANY,

> Petitioner

v.

FEDERAL ENERGY REGULATORY COMMISSION,

> Respondent

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

Before REAVLEY, HAYNES, and HIGGINSON, Circuit Judges.

HAYNES, Circuit Judge:

El Paso Electric Co. ("EP Electric") appeals from three decisions[1] in which the Federal Energy Regulatory Commission ("FERC" or the "Commission") reviewed and required revisions to certain compliance filings that EP Electric and other utilities filed with FERC pursuant to Order No.

---

[1]  Collectively, we refer to the decisions being challenged as FERC's "Compliance Orders," unless we specify a particular order.  The Compliance Orders include: *Pub. Serv. Co. of Colo.*, "Order on Compliance Filings," 142 FERC 61,206 (Mar. 22, 2013) (hereinafter "First Compliance Order"); *Pub. Serv. Co. of Colo.*, "Order on Rehearing and Compliance," 148 FERC 61,213 (Sept. 18, 2014) (hereinafter, "First Order on Rehearing"); and *Pub. Serv. Co. of Colo.*, "Order on Rehearing and Compliance," 151 FERC 61,128 (May 14, 2015) (hereinafter "Second Order on Rehearing").

No. 14-60822

1000. Order No. 1000 is FERC's rule regulating regional transmission planning and cost allocation by public utilities, also known as "jurisdictional utilities." *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC 61,051, 76 Fed. Reg. 49,842 (2011) (hereinafter "Order No. 1000"), *order on reh'g*, Order No. 1000-A, 139 FERC 61,132, 77 Fed. Reg. 32,184 (2012) (hereinafter "Order No. 1000-A"), *order on reh'g*, Order No. 1000-B, 141 FERC 61,044, 77 Fed. Reg. 64,890 (2012) (hereinafter "Order No. 1000-B").[2] The vast majority of EP Electric's challenges to FERC's actions through these compliance orders fail. However, we conclude that FERC has acted arbitrarily and capriciously in its mandates regarding the role of non-jurisdictional utilities in cost allocation and regional planning in the WestConnect region. We therefore GRANT the petitions for review in part, VACATE FERC's Compliance Orders on these issues for further explanation and proceedings, and DENY review or DISMISS the petitions in all other respects.

## I. Background

### A. Factual Background

This case concerns a scheme of planning, cost allocation, and regulation imposed by FERC on EP Electric and the Intervenor electricity providers.[3] This regulatory scheme relates to FERC's attempts to encourage regional planning and construction of facilities to transmit electricity. In the Federal Power Act ("FPA"), Congress gave FERC jurisdiction "over all facilities" for "the transmission of electric energy in interstate commerce and . . . the sale of

---

[2] We refer collectively to these rules as "Order No. 1000" unless otherwise specified.

[3] We granted leave for the following entities to intervene in this appeal: Arizona Public Service Company, Black Hills Power, Inc., Black Hills Colorado Electric Utility Company, LP, Cheyenne Light, Fuel, and Power Company, NV Energy, Inc., Public Service Company of New Mexico, Tucson Electric Power Company, UNS Electric, Inc., Xcel Energy Services Inc., and Public Service Company of Colorado.

electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). Section 205 of the FPA prohibited "unreasonable rates and undue discrimination 'with respect to any transmission or sale subject to the jurisdiction of the Commission,'" *New York v. FERC*, 535 U.S. 1, 7 (2002) (quoting 16 U.S.C. § 824d(a)–(b)), and Section 206 of the FPA gave FERC's predecessor "the power to correct such unlawful practices," *id.* (citing 16 U.S.C. § 824e(a)), including on its own motion, *S.C. Pub. Serv. Auth. v. FERC* (*South Carolina*), 762 F.3d 41, 49 (D.C. Cir. 2014).

In 2011, FERC enacted Order No. 1000 to address changes in the electric power industry and to keep rates just and reasonable. *Id.* at 52. As relevant to the challenges we address in this appeal, Order No. 1000 requires:

> Each transmission provider must participate in a regional transmission planning process that complies with the planning principles in [a previous order,] Order No. 890, produces a regional transmission plan for development of new regional transmission facilities, and includes procedures to identify transmission needs driven by public policy requirements established by federal, state, or local laws or regulations and evaluate potential solutions to those needs.

*South Carolina*, 762 F.3d at 52 (citing Order No. 1000 ¶¶ 2, 146, 203–05, 76 Fed. Reg. at 49,845, 49,867, 49,876–77).

Order No. 1000 mandated cost allocation reforms designed to incentivize the development of cost-efficient transmission facilities in the regional planning process. It did so, in part, by encouraging transparency and certainty about the costs and benefits of such projects, and about which parties would be eligible to fund and develop each project. *See* Order No. 1000 ¶ 11, 76 Fed. Reg. at 49,846. These cost allocation reforms require each transmission provider subject to FERC's jurisdiction to incorporate in their open access transmission tariff ("OAT Tariff") "a method (or set of methods) for allocating *ex ante* the costs of new regional transmission facilities that complies with six

regional cost allocation principles." *South Carolina*, 762 F.3d at 53 (citing Order No. 1000 ¶ 558, 76 Fed. Reg. at 49,929).

OAT Tariffs must comply with certain cost allocation principles, the most pertinent of which is cost causation.[4]  Under cost causation, "[t]he cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits." *Id.* at 53 (alteration in original) (quoting Order No. 1000 ¶ 586, 76 Fed. Reg. at 49,932).  This cost causation principle targets something called the "'free rider' problem," which FERC acknowledged that it sought to "address through its cost allocation reforms" in Order No. 1000.  Order No. 1000-A ¶ 562, 77 Fed. Reg. at 32,271.  A free rider is an entity that is subsidized by other entities because it refuses to invest in transmission development, allows other entities to pay for that development, and reaps the benefits.[5]  The free rider problem adversely affects the development of transmission facilities because "[a]ny individual beneficiary [of a new transmission facility] has an incentive to defer investment in the hopes that other beneficiaries [in the region] will value the project enough to fund its development."  Order No. 1000 ¶ 486, 76 Fed. Reg. at 49,919.  With the stated purpose of helping to alleviate the free rider

---

[4] OAT Tariffs originated before Order No. 1000.  Transmission providers must file an OAT Tariff "containing minimum terms of non-discriminatory transmission service." *South Carolina*, 762 F.3d at 50 (citation omitted).  Under Order No. 1000, OAT Tariffs now must incorporate the regional planning and cost allocation processes in which a utility will participate. *Id.* at 53, 56.

[5] As Order No. 1000 stated: "[F]ree riders by definition are entities who are being subsidized by those who pay the costs of the benefits that free riders receive for nothing." Order No. 1000-A ¶ 578, 77 Fed. Reg. at 32,274; *see also id.* ¶ 576, 77 Fed. Reg. at 32,273 ("[F]ree riders for purposes of Order No. 1000 are entities who do not bear cost responsibility for benefits that they receive in their use of the transmission grid, specifically benefits they receive from new transmission facilities selected in a regional transmission plan for purposes of cost allocation.").

problem, FERC mandated binding cost allocation, meaning that entities would not be allowed to opt out of their share of the costs of transmission facilities selected in regional transmission planning.[6] *Id.* ¶¶ 723–25, 76 Fed. Reg. at 49,949–50.

Another important principle for this appeal is that Sections 205 and 206 of the FPA only give FERC the authority to directly regulate "jurisdictional" utilities, a specified category of public utilities that transmit power in interstate commerce. *See generally South Carolina*, 762 F.3d at 93. The regional planning and cost allocation requirements of Order No. 1000 therefore only directly apply to jurisdictional utilities. *See* Order No. 1000-A ¶ 275, 77 Fed. Reg. at 32,337. FERC has thus far declined to exercise any authority it may or may not have under Section 211A of the FPA to *require* participation in these processes by non-jurisdictional utilities.[7] *See South Carolina*, 762 F.3d at 92–94; *see also* 16 U.S.C. § 824j-1(b) (stating that FERC "may . . . require an unregulated transmitting utility to provide transmission services . . . at rates that are comparable to those" the utility charges itself, and on terms and conditions "that are not unduly discriminatory or preferential").

### B. Procedural History

Together, EP Electric and Intervenors are members of a regional planning organization called WestConnect. EP Electric and Intervenors emphasize the unique nature of their geographic and transmission planning

---

[6] This binding cost allocation process only applies to projects selected in the regional transmission plan for the purposes of cost allocation, meaning these projects are approved as more efficient or cost-effective solutions to regional needs. *See* Order No. 1000 ¶ 5, 76 Fed. Reg. at 49,845.

[7] We express no opinion about whether (if at all) or in what manner FERC may exercise authority over non-jurisdictional utilities under Section 211A of the FPA, since FERC has not attempted to exercise any authority it may or may not have under this provision.

arrangement.  The WestConnect region is geographically comprised of ten non-jurisdictional utilities and eleven jurisdictional utilities.  This sets it apart from other regions in the Eastern and Western United States, which the parties claim are overwhelmingly owned by public utilities and run by jurisdictional regional organizations that have long-established transmission planning processes that impose binding cost allocation.  Since the jurisdictional utilities in WestConnect are dispersed "like Swiss cheese" throughout the region, the region has long relied on voluntary coordination and planning for regional transmission development.  This situation has resulted in shared costs and many jointly owned projects, even given the different regulatory framework in this region than other regions with more jurisdictional utilities.  The parties contend that regional planning that included only public utilities would not work for the WestConnect region.  Transmission projects generally require cooperation between both types of utilities.

EP Electric and the WestConnect jurisdictional utilities coordinated with each other to file tariff revisions in attempts to comply with Order No. 1000.  FERC addressed each of these revisions in its Compliance Orders.

## 1.  FERC's First Compliance Order

The first WestConnect compliance filing noted that jurisdictional and non-jurisdictional utilities alike tentatively intended to enroll in the WestConnect region.  EP Electric proposed that costs be allocated depending on the agreement of beneficiaries identified through the regional planning process, and its compliance filing specified that no entity was obligated to implement cost allocation.    Of note here, FERC's First Compliance Order required revision of the proposed cost allocation process to provide for "binding" cost allocations "upon identified beneficiaries." *Pub. Serv. Co. of Colo.*, "Order on Compliance Filings," 142 FERC 61,206, 62,164–65 ¶ 257 (Mar. 22, 2013) (hereinafter "First Compliance Order").  It also required that the jurisdictional

No. 14-60822

utilities enroll in the WestConnect region and provide a list of enrolled utilities in their tariffs. First Compliance Order ¶¶ 25–26, 142 FERC at 62,123.

## 2. FERC's First Order on Rehearing

WestConnect jurisdictional utilities responded in the second compliance filing by seeking a rehearing. They also proposed to include non-jurisdictional utilities in the regional planning as "Coordinating Transmission Owners" who would have all the rights of an enrolled jurisdictional utility, except that they would not be subject to binding cost allocation. The WestConnect utilities proposed to exclude any project from regional cost allocation that "electrically interconnects with, or that is demonstrated to provide quantifiable benefits" to a non-enrolled transmission owner in the WestConnect region. The utilities proposed to study and identify projects that met regional needs, including those of the non-jurisdictional utilities, but to obtain funding from participants in a voluntary manner rather than through a binding cost allocation that could not include the non-jurisdictional utilities. The non-jurisdictional utilities supported this approach.

In FERC's First Order on Rehearing, FERC accepted the inclusion of non-jurisdictional utilities as Coordinating Transmission Owners for regional planning and the ability of the regional planning process to account for the Coordinating Transmission Owners' needs. *Pub. Serv. Co. of Colo.*, "Order on Rehearing and Compliance," 148 FERC 61,213, 62,289–90 ¶¶ 54–55 (Sept. 18, 2014) (hereinafter, "First Order on Rehearing"). Again, FERC rejected the idea that projects benefitting Coordinating Transmission Owners (non-jurisdictional utilities) could be excluded from binding cost allocation. *Id.* ¶ 56, 148 FERC at 62,290. FERC reasoned that excluding such projects from regional planning "would unduly restrict consideration of transmission facilities that nonetheless may have regional benefits and are determined to be more efficient or cost-effective transmission solutions to regional

7

transmission needs." *Id.* FERC ordered the WestConnect utilities to revise their proposals accordingly.

### 3. FERC's Second Order on Rehearing

The WestConnect utilities again sought a rehearing and filed proposed revisions, objecting that the First Order on Rehearing would create free ridership and violate cost causation. Specifically, the WestConnect utilities objected that FERC's First Order on Rehearing mandated that jurisdictional utilities pay the costs to develop new transmission facilities and exempted non-jurisdictional utilities from those costs. The WestConnect utilities argued that this structure violated cost causation, which requires allocating costs in at least a roughly commensurate fashion to those who receive the benefits of transmission development. Additionally, if non-jurisdictional utilities could benefit from transmission development without paying for it, they would become the subsidized free riders that Order No. 1000 sought to reduce or eliminate. In the alternative, the WestConnect utilities also proposed to make a project ineligible for cost allocation if a non-jurisdictional utility opted out of benefits allocated to it and the re-allocation of costs to jurisdictional utilities increased their original costs more than 10%. The non-jurisdictional utilities supported this proposal.

FERC rejected this proposal and the request for rehearing, noting that

> [w]hile [the situation] may create the potential for free ridership if a non-public utility transmission provider elects to not enroll in a region and benefits from a transmission project selected in the regional transmission plan for purposes of cost allocation, that potential exists because the transmission project has benefits for entities that are not required to enroll, and have not enrolled, in the region.

*Pub. Serv. Co. of Colo.,* "Order on Rehearing and Compliance," 151 FERC 61,128, 61,785 ¶ 29 (May 14, 2015) (hereinafter "Second Order on Rehearing"). FERC stated that "Order No. 1000 did not seek to eliminate all instances of

No. 14-60822

free ridership." *Id.* ¶ 30, 151 FERC at 61,785.  FERC asserted that it could choose to balance competing goals, enact reforms on an incremental basis, that it need not ensure perfect cost causation, and that these reforms were not inconsistent with Order No. 1000. *Id.*  FERC noted that the parties had worked cooperatively together in the past and encouraged them to minimize free rider concerns themselves by working with each other to accept their respective shares of costs associated with the benefits of transmission planning.  *Id.* ¶ 32, 151 FERC at 61,785–86.

Finally, FERC declined to accept WestConnect's 10% cap proposal for cost allocation "because the proposal might lead to the transmission planning process rejecting regional cost allocation for a proposed transmission solution that continues to be a more efficient or cost-effective solution for the remaining beneficiaries compared to other alternatives even after a cost shift."  *Id.* ¶ 57, 151 FERC at 61,791.  EP Electric and the Intervenors timely petitioned for review of FERC's First Order on Rehearing, which was held in abeyance on FERC's motion until a petition was filed from FERC's Second Order on Rehearing.  All of FERC's Compliance Orders are now before us.

## II.  Standard of Review

We review FERC's orders under the "arbitrary and capricious" standard of the Administrative Procedure Act ("APA").  *See La. Pub. Serv. Comm'n v. FERC* (*La. II*), 771 F.3d 903, 909 (5th Cir. 2014) (citing 5 U.S.C. § 706(2)(A)), *cert. denied*, 135 S. Ct. 2072 (2015).  FERC acts reasonably and permissibly under this standard when it "examine[s] the relevant data and articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id*. (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  FERC's factual findings are conclusive if supported by substantial evidence, which is "such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion." *South Carolina*, 762 F.3d at 54 (citation omitted); *see also* 16 U.S.C. § 825*l*(b).

FERC's choices in regulating rates, tariffs, and related practices involve technical issues within its purview that are entitled to great deference. *La. II*, 771 F.3d at 909–10; *South Carolina*, 762 F.3d at 54–55. Therefore, when FERC designs rates, we give deference to those designs and defer to FERC's construction of any ambiguous language in agreements setting rates, "*so long as [FERC's construction] is reasonable.*" *See La. II*, 771 F.3d at 910 (emphasis added). However, the deference we give to FERC is not unlimited. We do not defer to FERC's constructions of tariffs unless FERC "relied on its factual or technical expertise in arriving at its interpretation." *Id.* Additionally, we do not owe FERC deference if it "has not substantiated the application of its policy, either through the development of specific facts or by making a reasoned explanation." *Fla. Gas Transmission Co. v. FERC*, 876 F.2d 42, 45 (5th Cir. 1989). When FERC fails to rely on its technical expertise, or fails to substantiate the application of its policy, we may conclude that FERC's actions are arbitrary and capricious and vacate and remand FERC's orders for further consideration.[8] *See id.*; *see also Mich. Pub. Power Agency v. FERC*, 405 F.3d 8, 16 (D.C. Cir. 2005) (remanding for further explanation where FERC failed to adequately explain a new policy).

## III. Discussion

EP Electric and the Intervenors challenge multiple facets of FERC's

---

[8] The Supreme Court has emphasized the deference courts must give to FERC, but that deference only applies when FERC has "articulate[d] a satisfactory explanation for its action." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782, 784 (2016) (citation omitted). That explanation is lacking here. Therefore, we exercise our "important but limited role . . . to ensure that the Commission engaged in reasoned decisionmaking" by remanding for a satisfactory explanation of FERC's decision in the Compliance Orders. *Id.* at 784.

No. 14-60822

decisions in the Compliance Orders.  We address each challenge in turn.[9]

## A.  FERC's Mandates Regarding the Non-Jurisdictional Utilities

In this appeal, the Utilities argue that FERC's mandate of binding cost allocation was arbitrary and capricious because it applies only to the jurisdictional utilities and thus forces the jurisdictional utilities to subsidize projects benefitting the non-jurisdictional utilities. This creates a "free rider" problem that Order No. 1000 sought to reduce or eliminate.  The Utilities therefore assert that this marks a departure from Order No. 1000 and unlawfully violates the principle of cost causation that FERC follows to ensure just and reasonable rates.

As a threshold issue, we conclude that this challenge is not a collateral attack on Order No. 1000.  Although Order No. 1000's failure to require the participation of non-jurisdictional utilities in binding cost allocation has been generally challenged, *see South Carolina*, 762 F.3d at 92–97, the Utilities' challenge differs in this case because of the circumstances of the WestConnect region.  Before the D.C. Circuit, FERC argued that non-jurisdictional utilities were likely to voluntarily participate, but it is clear now that non-jurisdictional utilities in WestConnect do not intend to subject themselves to binding cost allocation.  The Utilities point out that not a single non-jurisdictional utility has enrolled in the WestConnect planning region—instead, all have chosen to participate as Coordinating Transmission Owners and avoid binding cost allocation.  The Utilities' attack on FERC's treatment of non-jurisdictional utilities also stems from a discrepancy between how FERC described its goals in Order No. 1000—namely, to ensure just and reasonable rates by reducing

---

[9] EP Electric and Intervenors briefed these issues separately.  Intervenors "adopt and incorporate the list of issues identified by El Paso in its brief," but "focus their briefing" only on certain arguments.  Therefore, we refer to arguments made only in EP Electric's brief as EP Electric's arguments.  When discussing arguments made fully by both EP Electric and the Intervenors, we refer to the parties collectively as the "Utilities."

11

free ridership and following cost causation principles—and how those principles were applied in the WestConnect region. *Cf. City of Redding v. FERC*, 693 F.3d 828, 837 (9th Cir. 2012) ("The relevant question is 'whether a reasonable party in the petitioner's position would have perceived a very substantial risk that the order meant what the Commission now says it meant.'" (citation omitted)). Therefore, we conclude this challenge does not constitute a collateral attack, and we consider it on the merits. *See generally Dominion Res., Inc. v. FERC*, 286 F.3d 586, 589–90 (D.C. Cir. 2002).

We conclude that FERC's Compliance Orders fail to adequately explain how the mandates in those orders do not ensure *un*just and *un*reasonable rates as between jurisdictional and non-jurisdictional utilities (and their customers) in the WestConnect region. We therefore grant the petition for review and remand this issue to FERC for further proceedings consistent with this opinion.

FERC argues that it need not account for the non-jurisdictional utilities or more forcefully incentivize their participation in binding cost allocation for three primary reasons. First, FERC argues that the FPA only requires it to regulate *jurisdictional* utilities. Accordingly, it need not account for the benefits to the *non-jurisdictional* utilities in any analysis of whether the regional planning process requires paying costs roughly commensurate with the benefits received. FERC chose not to regulate non-jurisdictional utilities through Order No. 1000. Thus, FERC contends that any free ridership resulting from its Compliance Orders for the WestConnect region does not contravene Order No. 1000's purpose of reducing free ridership. Second, FERC argues that it may regulate incrementally, relying at first on the voluntary participation of non-jurisdictional utilities before attempting to more forcefully incentivize participation. Third, FERC argues that cost causation need not be perfect, and that this imprecise form of cost causation will still result in more

efficient regional transmission planning, such that FERC claims it is acting within its discretion to balance competing objectives.

It is true that Order No. 1000 declined to regulate non-jurisdictional utilities and therefore does not address free ridership by those utilities. It is also certainly within FERC's discretion to balance competing objectives, and FERC's regulations need only roughly correlate costs to benefits. Yet, FERC has a statutory duty to ensure just and reasonable rates, and Order No. 1000 emphasized the cost causation principle in service of that goal. *See* Order No. 1000-A ¶ 592, 77 Fed. Reg. at 32,276; 16 U.S.C. § 824d(a) (giving FERC regulatory authority to ensure "just and reasonable" rates and practices and declaring that "any such rate or charge that is not just and reasonable is . . . unlawful"); *see also Morgan Stanley Capital Grp. Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cty.*, 554 U.S. 527, 545 (2008) ("There is only one statutory standard for assessing wholesale-electricity rates, whether set by contract or tariff—the just-and-reasonable standard."). As the Seventh Circuit held, utilities and FERC should not approve rates for transmission or electric services that do not "reflect to some degree the costs actually caused by" the person or entity paying them. *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 476 (7th Cir. 2009) (quoting *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992)).

As they stand, the Compliance Orders do not apply that foundational principle of cost causation for about half of the utilities in the WestConnect region.[10] FERC's Compliance Orders nowhere provide a reasoned explanation

---

[10] Order No. 1000 clearly linked cost causation, the elimination or reduction of free ridership, just and reasonable rates, and more efficient transmission planning and development. Order No. 1000-A states:

> The requirements of Order No. 1000 are based on the principle of cost causation, which requires that costs be allocated in a way that is roughly commensurate with benefits. The principle of cost causation is intended to

for why the non-jurisdictional utilities have incentive or obligation to participate in binding cost allocation when they can get many of the same benefits at the jurisdictional utilities' expense.[11]  *Cf. Fla. Gas*, 876 F.2d at 45 (vacating and remanding FERC orders for failing to provide a reasoned explanation supporting FERC's policies); *State Farm*, 463 U.S. at 50, 57 (explaining that "the courts may not accept appellate counsel's *post hoc* rationalizations for agency action" and remanding where an agency "failed to supply the requisite 'reasoned analysis'").  Furthermore, FERC does not explain how it can meet its obligation to ensure just and reasonable rates by effectively assuring that many of the costs of new development will be imposed on only half of the utilities in the WestConnect region.  *See* Order No. 1000 ¶ 640, 76 Fed. Reg. at 49,939 (stating that parties cannot opt out of cost allocation for a transmission project if they disagree that they will benefit from it, since "[p]ermitting each entity to opt out would not minimize the regional free rider problem that [FERC sought] to minimize in [Order No. 1000]").

Before this court, FERC argues that the Compliance Orders may not result in unjust and unreasonable rates because it may be able to use the "reciprocity condition" to incentivize participation of non-jurisdictional utilities in binding cost causation.  *See generally South Carolina*, 762 F.3d at 92

---

prevent subsidization by ensuring that costs and benefits correspond to each other. Indeed, in seeking to eliminate free riders on the transmission grid, Order No. 1000 seeks to eliminate a form of subsidization, as free riders by definition are entities who are being subsidized by those who pay the costs of the benefits that free riders receive for nothing.

Order No. 1000-A ¶ 578, 77 Fed. Reg. at 32,274; *see also* Order No. 1000 ¶ 487, 76 Fed. Reg. at 49,919 (associating benefits-based cost allocation with more just and reasonable rates).

[11]  *See, e.g.*, First Order on Reh'g ¶¶ 54–57, 148 FERC at 62,289–91 (describing how non-jurisdictional utilities may participate in WestConnect's regional planning process as Coordinating Transmission Owners without being bound to cost allocation and should be able to reject any cost allocation that attempts to assign a Coordinating Transmission Owner costs in proportion to the benefits that the Coordinating Transmission Owner would receive from the project).

No. 14-60822

(explaining that the "reciprocity condition," as applied by Order No. 1000, requires that non-jurisdictional utilities that choose to access the transmission lines of jurisdictional utilities provide transmission service to those jurisdictional utilities on comparable terms).  According to FERC, under the reciprocity condition, "if a non-jurisdictional utility takes transmission service from a jurisdictional utility, it must participate in regional planning and cost allocation processes."  FERC Br. 8; *see also* Order No. 1000 ¶¶ 818–19, 76 Fed. Reg. at 49,961; Order No. 1000-A ¶¶ 771–75, 77 Fed. Reg. at 32,300–01.  Yet, as FERC explained in Order No. 1000-A:

> *A non-public utility transmission provider may continue to satisfy the reciprocity condition in one of three ways.* First, it may provide service under a tariff that has been approved by the Commission under the voluntary "safe harbor" provision of the *pro forma* [Open Access Transmission Tariff ("OATT")]. A non-public utility transmission provider using this alternative submits a reciprocity tariff to the Commission seeking a declaratory order that the proposed reciprocity tariff substantially conforms to, or is superior to, the *pro forma* OATT. The non-public utility transmission provider then must offer service under its reciprocity tariff to any public utility transmission provider whose transmission service the non-public utility transmission provider seeks to use. Second, the non-public utility transmission provider may provide service to a public utility transmission provider under a bilateral agreement that satisfies its reciprocity obligation. Finally, the non-public utility transmission provider may seek a waiver of the reciprocity condition from the public utility transmission provider.

Order No. 1000-A ¶ 771, 77 Fed. Reg. at 32,300 (emphasis added).

How the reciprocity condition might operate in the WestConnect region is a question the parties have raised, which has been left unanswered by the Compliance Orders and FERC's arguments on appeal.  For example, although FERC has stated that the reciprocity condition may be satisfied in three ways, *see id.*, in the Compliance Orders, FERC only addressed one method of satisfying the reciprocity condition.  *See* First Order on Reh'g ¶ 55 n.101, 148

15

No. 14-60822

FERC at 62,290 n.101 (discussing only the ability "to maintain a reciprocity tariff under the voluntary 'safe harbor' provision"). In fact, FERC only vaguely mentioned the reciprocity condition one time in the Compliance Orders, in a footnote, and utterly failed to explain how it would effectively operate to incentivize participation in the unique WestConnect region. *See id.* Intervenors argue before us that the reciprocity condition would not work to incentivize participation by the non-jurisdictional utilities in the WestConnect region. Intervenors assert that only the public utility from which the non-jurisdictional utility seeks service can enforce reciprocity and that geography or pre-existing agreements might often prevent non-jurisdictional utilities from having to seek service from the same jurisdictional utilities that demand participation in binding cost allocation for specific development projects. *See generally* Intervenors' Reply Br. 9–12. We do not address the validity of EP Electric and Intervenors' arguments on this point. We can only say that the agency record lacks the information we need to properly evaluate this issue.

It is well settled that we "must disregard any *post hoc* rationalizations of [an agency's] action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision." *Luminant Generation Co. v. U.S. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962)). We cannot determine whether the reciprocity condition as applied by Order No. 1000 would sufficiently incentivize participation and lead to just and reasonable rates in the WestConnect region due to FERC's failure to address the reciprocity condition's effect during agency proceedings. *See United States v. Garner*, 767 F.2d 104, 117 (5th Cir. 1985) (noting that appellate courts must rely on the agency's stated rationale at the time of its decision "[p]artly in order to provide courts with a foundation for judicial review"). We therefore do not rely on the use of the reciprocity condition as a rationale for upholding the Compliance

No. 14-60822

Orders.[12]   If FERC views the operation of the reciprocity condition as a reasonable justification for its actions, it must more fully explain that logic on remand.

Absent a more reasoned explanation for why the non-jurisdictional utilities will participate in the binding cost allocation process, or why their lack of participation will not result in unjust and unreasonable rates, we conclude that the Compliance Orders are arbitrary and capricious and cannot be approved in their current form.[13]   *See, e.g.*, *Fla. Gas*, 876 F.2d at 45; *Ill.*

---

[12] The dissenting opinion argues we should consider the reciprocity condition and trust FERC's judgment that the condition will incentivize the non-jurisdictional utilities' participation. Deference to FERC on this issue is not possible because FERC has not made clear how the reciprocity condition will operate in this unique region to incentivize participation. Due to that lack of explanation in the face of the Utilities' objections below, the Utilities were not given the opportunity to challenge FERC's terse reasoning, except in equally terse form on appeal and without a properly developed agency record. To avoid this scenario, our precedent prevents us from considering *post hoc* rationalizations, and we decline to do so here. *See Luminant*, 675 F.3d at 925; *Garner*, 767 F.2d at 117. We respect FERC's expertise, but when FERC does not use that expertise to explain its mandates, we cannot fill the vacuum with hopeful speculation. *See Fla. Gas*, 876 F.2d at 45; *Ill. Commerce Comm'n*, 576 F.3d at 475–76, 478; *Mich. Pub. Power Agency*, 405 F.3d at 16.

[13] The dissenting opinion relies on FERC's reasoning for rejecting a 10% cost cap in the Second Order on Rehearing. In that Order, FERC specified that if a Coordinating Transmission Owner rejects binding cost allocation for a project that would provide benefits to that Owner, the transmission planning process removes the benefits that Owner would reap and recalculates future cost allocation determinations such that they only account for the benefits accorded to the entities that have agreed to binding cost allocation. *See* Second Order on Reh'g ¶ 57, 151 FERC at 61,791. The dissenting opinion argues this sufficiently satisfies FERC's mandate of ensuring just and reasonable rates because the new cost allocation would allocate costs "commensurate with the benefits *considered*." *Id.* (emphasis added). We respectfully disagree that this language provides a sufficient explanation of how this scheme will result in just and reasonable rates. It is merely a reworded version of FERC's argument that, because it need not regulate non-jurisdictional utilities, the process need not account for the benefits that accrue to those utilities. Even if those benefits are excluded from cost allocation calculations after the non-jurisdictional utilities opt out of paying for their share of a specific project, FERC has suggested that the jurisdictional utilities involved would still be left to pay the entire cost of that project—including the cost associated with the benefits received by the non-paying, non-jurisdictional utilities. *See* Second Order on Reh'g ¶ 57, 151 FERC at 61,791 (rejecting the proposal to make a project ineligible for binding cost allocation if "the cost shift to remaining beneficiaries would exceed 10 percent of their prior cost allocation" because it might exclude too many projects from regional planning and cost allocation); *id.* at ¶ 31, 151 FERC at 61,785 (admitting that "this

No. 14-60822

*Commerce Comm'n*, 576 F.3d at 475–76, 478 (remanding when FERC failed to adequately explain the approval of a pricing scheme and failed to measure the correlation between benefits and costs, inquiring why "a different method . . . , based more closely on cost-causation principles, [would] jeopardize" FERC's policy "or be infeasible"). We therefore GRANT the petition for review and REMAND this case to FERC for further explanation and fact finding.

## B. *EP Electric's Other Challenges*

EP Electric also separately challenges whether FERC violated the APA by requiring binding cost allocation at the regional planning stage and by requiring the regional planning process to select a particular developer, entitling that developer to rely on cost allocation for a given project. EP Electric argues that FERC unlawfully sub-delegated its ratemaking duties under the FPA by giving the WestConnect Planning Management Committee ("WestConnect Committee") the power to select projects with binding cost allocation. Binding cost allocation also violates the *Mobile-Sierra* doctrine,[14]

---

situation may create the potential for free ridership"). The non-jurisdictional utilities thus may receive benefits for free, while the jurisdictional utilities and their customers may pay more than their share of the costs associated with the benefits they receive. FERC admitted in the Compliance Orders that this scheme has the potential to result in free ridership by the non-jurisdictional utilities, *see id.* at ¶ 31, 151 FERC at 61,785, but has failed to explain how the current orders satisfy its statutory mandate—except by ignoring the benefits the non-jurisdictional utilities would receive. This does not suffice. It may be that the reciprocity condition provides sufficient incentive, or that FERC has some other reason to think that costs will be allocated in a manner that is commensurate with the benefits received by jurisdictional and non-jurisdictional utilities. On this record, we do not discern such an explanation, and it is our duty as the reviewing court to ensure that we receive a sufficient explanation. *See Fla. Gas*, 876 F.2d at 45; *Ill. Commerce Comm'n*, 576 F.3d at 475–76, 478; *Mich. Pub. Power Agency*, 405 F.3d at 16.

[14] The *Mobile-Sierra* doctrine "address[es] the Commission's authority 'to modify rates set bilaterally by contract rather than unilaterally by tariff.'" *South Carolina*, 762 F.3d at 85–86 (quoting *Morgan Stanley*, 554 U.S. at 532) (citing *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.* (*Mobile*), 350 U.S. 332 (1956), and *Fed. Power Comm'n v. Sierra Pac. Power Co.* (*Sierra*), 350 U.S. 348 (1956)). "Under the *Mobile-Sierra* doctrine, [FERC] must presume that the [electricity] rate set out in a freely negotiated wholesale-energy contract meets the 'just and reasonable' requirement imposed by law. The presumption may be overcome only

according to EP Electric.  Finally, EP Electric claims that in mandating that the WestConnect Committee select a developer for each project in the regional planning process, FERC has improperly infringed on states' exclusive authority over the siting and construction of transmission facilities.

We conclude that all of these challenges are barred as impermissible collateral attacks, save the argument regarding improper sub-delegation, and we find that challenge lacks merit.  We have previously declined to "entertain a petition for review that collaterally attacks a prior FERC order."  *City of Redding*, 693 F.3d at 837 (citation omitted); *see, e.g.*, *La. Pub. Serv. Comm'n v. FERC*, 761 F.3d 540, 556–57, 560 (5th Cir. 2014).  "[A]n objection is a collateral attack on an earlier order 'only if a reasonable firm in [petitioners'] position would have perceived a very substantial risk that the [order] meant what the Commission now says it meant.'"  *Cent. Hudson Gas & Elec. Corp. v. FERC*, 783 F.3d 92, 105 (2d Cir. 2015) (alterations in original) (quoting *Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122, 1126 (D.C. Cir. 2011)).

To distinguish between collateral attacks and permissible challenges, we ask whether the FERC order the petition challenges was a clarification or a modification of a prior FERC order.[15]  *See generally Dominion*, 286 F.3d at 589.  FERC's Compliance Orders on the issues challenged by EP Electric did little more than clarify Order No. 1000's directives.  *See Pac. Gas & Elec. Co. v.*

---

if FERC concludes that the contract seriously harms the public interest."  *Morgan Stanley*, 554 U.S. at 530.

[15]  The inquiry into whether FERC violated the APA by changing its interpretation of Order No. 1000 through the Compliance Orders is similar to the collateral attack inquiry.  *Compare Pac. Gas & Elec. Co. v. FERC*, 464 F.3d 861, 868–69 (9th Cir. 2006), *with City of Idaho Falls v. FERC*, 629 F.3d 222, 227, 230–31 (D.C. Cir. 2011).  In this context, both inquiries require us to discern whether FERC clarified or modified Order No. 1000 through the Compliance Orders.  Since we find that most of EP Electric's challenges are collateral attacks because they challenge mere clarifications of Order No. 1000, we do not review these challenges on their merits, and we do not separately address EP Electric's procedural arguments.

*FERC*, 464 F.3d 861, 868–69 (9th Cir. 2006) (holding a challenge was an impermissible collateral attack on an order that "simply clarified and implemented its previous order," but did not "substantively alter the [order's] meaning or scope").  The fact that the D.C. Circuit disposed of many similar arguments in *South Carolina* buttresses this conclusion.

First, the Compliance Orders merely clarified that Order No. 1000 meant to impose binding cost allocation, which Order No. 1000 clearly signaled and the D.C. Circuit has already recognized.  *See, e.g.*, Order No. 1000-A ¶¶ 567–68, 77 Fed. Reg. at 32,272; Order No. 1000 ¶ 558,76 Fed. Reg. at 49,929; *South Carolina*, 762 F.3d at 56.  EP Electric may not bring this collateral attack on binding cost allocation, and we DISMISS its petition as to this issue.  *See La. Pub. Serv. Comm'n*, 761 F.3d at 558, 560.

Second, the selection of one developer that will be eligible for cost allocation in the regional planning process is a predictable clarification of Order No. 1000's reforms, and we DISMISS the petition for review as to this issue.  Order No. 1000 explicitly declined to grant developers rights to build projects, but noted that its "framework" allowed "*the* developer" of a facility selected in a regional transmission plan for the purposes of cost allocation "to rely on the relevant cost allocation method or methods within the region should it desire to move forward with its transmission project."  Order No. 1000 ¶ 339, 76 Fed. Reg. at 49,900 (emphasis added).  This suggests that Order No. 1000 contemplated that one developer could rely on the cost allocation for its proposed project, even if that was not made explicit.  Granting one developer eligibility to rely on binding cost allocation may also serve FERC's goals of comparably evaluating all potential transmission solutions and promoting the more efficient or cost-effective solutions.  *See, e.g.*, Order No. 1000 ¶¶ 255, 332, 339, 76 Fed. Reg. at 49,885–86, 49,900.

EP Electric's related attack on the single-developer requirement as an

improper usurpation of state authority over siting and construction fails for similar reasons. We conclude that neither Order No. 1000 nor the Compliance Orders "require facility construction nor allow a party to build without securing necessary state approvals." *South Carolina*, 762 F.3d at 62–64. We DISMISS EP Electric's petition as to this issue, as it constitutes a collateral attack. *See La. Pub. Serv. Comm'n*, 761 F.3d at 558, 560.

Finally, we DENY review as to EP Electric's argument that the Compliance Orders violate the *Mobile-Sierra* doctrine. The *Mobile-Sierra* doctrine prevents FERC from *abrogating* a valid contract setting rates unless that contract seriously harms the public interest. *See Morgan Stanley*, 554 U.S. at 548. EP Electric argues that, conversely, FERC cannot *create* a contract and impose it on unwilling parties through its mandate of binding cost allocation and other regional planning reforms. We agree with the D.C. Circuit that the *Mobile-Sierra* doctrine is inapposite here, and we DISMISS the petition insofar as it brings this collateral attack. *See South Carolina*, 762 F.3d at 85–86.

The sole remaining challenge that is not barred as a collateral attack is EP Electric's argument that FERC improperly delegated its authority to review rates under FPA Section 205 by giving the WestConnect Committee the power to impose binding cost allocation. According to EP Electric, Order No. 1000 indicated that FERC would review proposed tariffs of developers selected in the regional planning processes through its Section 205 authority. We agree that there is some inconsistency between the Compliance Orders and Order No. 1000 on this issue. *Compare* Order No. 1000 ¶ 543, 76 Fed. Reg. at 49,927, *and* Order No. 1000-A ¶ 568, 77 Fed. Reg. at 32,272, *with* First Order on Reh'g ¶ 341, 148 FERC at 62,353. We therefore reach the merits of this challenge. *See generally City of Redding*, 693 F.3d at 836–38 (holding a challenge was not

a collateral attack in part because FERC had given inconsistent guidance on its policy).

Nevertheless, we cannot agree with EP Electric that FERC has "abdicate[d] its role as a rational decision-maker" through the Compliance Orders. *See La. Pub. Serv. Comm'n*, 761 F.3d at 551–52 (citation omitted). Even if FERC has abandoned its practice of evaluating tariffs and cost allocations de novo through Section 205 proceedings, it has extensively reviewed the procedures that will produce cost allocations through these Compliance Orders. Additionally, FERC has retained the authority to review transmission planning and cost allocations pursuant to FPA Section 206, through which FERC may review challenges on its own motion or through complaints about rates and practices. 16 U.S.C. § 824e(a). FERC "exercised its role when it initially reviewed" WestConnect's regional planning and cost allocation processes, and "FERC has clarified that it will continue to exercise oversight . . . in a Section 206 complaint proceeding." *La. Pub. Serv. Comm'n*, 761 F.3d at 552. We DENY EP Electric's petition for review of FERC's delegation of authority to the WestConnect Committee.

## IV. Conclusion

For the reasons stated, we GRANT the petitions for review in part, as to the challenge to the role of non-jurisdictional utilities in the regional planning and cost allocation processes of the WestConnect region. We VACATE FERC's Compliance Orders on this issue and REMAND for further explanation and fact finding consistent with this opinion. We DENY review as to EP Electric's argument that FERC improperly sub-delegated its authority to the WestConnect Committee. We DISMISS the petitions as to the remaining challenges, as we conclude those challenges constitute impermissible collateral attacks.

No. 14-60822

REAVLEY, Circuit Judge, dissenting:

There is no justification to remand for "a more reasoned explanation for why the non-jurisdictional utilities will participate in the binding cost allocation process, or why their lack of participation will not result in unjust and unreasonable rates." The Majority errs by labelling Order No. 1000's reciprocity condition a *post hoc* rationalization and errs more deeply still by failing to accord FERC's policy decision appropriate deference.

FERC, Order No. 1000 includes the "reciprocity condition" that requires non-jurisdictional utilities to "participate in transmission planning and cost allocation in exchange for open access." *S. Carolina Pub. Serv. Auth. v. F.E.R.C.*, 762 F.3d 41, 92 (D.C. Cir. 2014) (citing Order No. 1000 ¶¶ 818–19, 76 Fed.Reg. at 49,961). "By conditioning non-public utilities' access to the open systems of public utilities on the former's adherence to the planning and cost allocation requirements, [Order No. 1000] encourages non-public utilities to participate in planning and cost allocation." *Id.* at 93; *see also id.* at 94–95 (explaining that the reciprocity condition requires "both transmission planning and cost allocation" from "utilities that choose to seek Commission-jurisdictional transmission service").

The court here disregards the reciprocity condition because only one mention is made in the Compliance Orders. However, in the Second Order on Rehearing, FERC reminds that "if a coordinating transmission owner does not accept the cost allocation, the transmission planning process removes the benefits of those coordinating transmission owners that do not accept the cost allocation" and cost allocation determinations therefore remain "commensurate with the estimated benefits considered." Second Order on

Rehearing at ¶ 57.  In any event, the reciprocity condition is a *rule* found within Order No. 1000 and cannot be written off as a mere *post hoc* rationalization.

FERC has the responsibility of deciding *how* to achieve its statutory mandate of ensuring just and reasonable rates, and we must trust its judgment that the reciprocity condition adequately incentivizes participation of the non-jurisdictional utilities.  We are not "to ask whether [the] decision is the best one possible or even whether it is better than the alternatives," including the Utilities' alternative suggestions.  *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016).  "[N]owhere is that more true than in a technical area like electricity rate design."  *Id.*

Thus, FERC does not have to convince us that its approach is sounder than the Utilities' approach.  "The disputed question here involves both technical understanding and policy judgment," and the record establishes that FERC "engaged in reasoned decisionmaking" by weighing competing views, selecting an approach based on the methods and goals of Order No. 1000, and "intelligibly" articulating "the reason for making that choice."  *Id.* at 784.  This is sufficient.  *Id.*  For but one example of FERC's reasoned decisionmaking, consider Paragraph 31 of the Second Order on Rehearing.  There, FERC explained why it would permit the non-jurisdictional utilities to participate in the WestConnect region as Coordinating Transmission Owners without imposing binding cost allocation upon them:

> The Commission has accepted Filing Parties' proposal to plan for non-public utility transmission providers, as coordinating transmission owners, without requiring that those non-public utility transmission providers enroll in the WestConnect transmission planning region and, thus, be subject to binding cost allocation.  The Commission explained that doing so "will increase transparency, support the building of a record with respect to

transmission planning, and allow regional transmission planning
to be conducted inclusive of nonpublic utility transmission
providers, so as to expand opportunities for identifying and
proposing more efficient or cost-effective regional transmission
projects." Allowing a non-public utility transmission provider to
determine, consistent with its statutes, whether to accept the cost
allocation may further expand open, transparent planning. By not
enrolling, the non-public utility transmission providers are not full
members of the WestConnect transmission planning region and,
therefore, cannot be involuntarily allocated the costs of new
transmission facilities that are selected in the regional
transmission plan for purposes of cost allocation. While this
situation may create the potential for free ridership, as it does
when any entity not enrolled in the transmission planning region
benefits from a new transmission facility, it is not inconsistent
with Order No. 1000.
(Second Opinion on Rehearing at ¶ 31.)

This is precisely the reasoned decision-making to which we must defer.

FERC has decided that, even accounting for the Utilities' free rider objection,

other considerations support its determination.    The Majority perceives a

major concession in this paragraph: that under the Compliance Orders, there

may be free riders.   Majority Op. at 17–18 n.13.  It is no such thing for three

reasons.  First, as has been already explained, the statement regarding free

riders merely shows that, even when considering "the potential for free

ridership," FERC's policy decision best serves its goals.  This conclusion merits

our deference.

Second, the statement demonstrates that the sort of free rider problem

the Utilities complain of is not unique but rather is the same free rider problem

that arises "when any entity not enrolled in the transmission planning region

benefits from a new transmission facility." In other words, this particular free

rider problem is indistinguishable from the free rider problem acknowledged

in Order No. 1000.   (Order No. 1000 ¶ 660, 76 Fed.Reg. at 49,942, ("We acknowledge that this Final Rule's approach may lead to some beneficiaries of transmission facilities escaping cost responsibility because they are not located in the same transmission planning region as the transmission facility. Nonetheless, the Commission finds this approach to be appropriate.").

Third, there is simply no support for the conclusion that a "potential for free ridership" is fatal to FERC's regulatory scheme.  *See South Carolina*, 762 F.3d at 88 ("[N]othing requires the Commission to ensure full or perfect cost causation").  All plans have drawbacks.  FERC's "balancing of the competing goals" and incremental approach to reform demand our deference.  *Id.*

At bottom, the Majority errs by treating the required "satisfactory explanation" as one that actually persuades the court as to the wisdom of FERC's decision or that actually rebuts the Utilities' speculative contentions regarding unintended consequences.[1]  Across three compliance orders, FERC has "addressed th[is] issue seriously and carefully, providing reasons in support of its position and responding to the principal alternative advanced." *Electric Power Supply Association*, 136 S. Ct. at 784.  We must defer.

---

[1] *See Majority Op.* at 13–14, 17 ("FERC's Compliance Orders nowhere provide a reasoned explanation for why the non-jurisdictional utilities have incentive or obligation to participate in binding cost allocation when they can get many of the same benefits at the jurisdictional utilities' expense. . . . FERC does not explain how it can meet its obligation to ensure just and reasonable rates by effectively assuring that many of the costs of new development will be imposed  on only half of the utilities in the WestConnect region. . . . Absent a more reasoned explanation for why the non-jurisdictional utilities will participate in the binding cost allocation process, or why their lack of participation will not result in unjust and unreasonable rates, we conclude that the Compliance Orders are arbitrary and capricious and cannot be approved in their current form.").